# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| STATE OF MINNESOTA, BY ITS ATTORNEY GENERAL KEITH ELLISON, | Civil Action No. 21-mc-00081 |
| *Plaintiff*, | *(Pending in U.S. District Court for the District of New Jersey, Case No. 2:18-cv-14999-BRM-LHG)* |
| vs. | |
| SANOFI-AVENTIS U.S. LLC. NOVO NORDISK, INC., AND ELI LILLY AND CO., | **MEMORANDUM IN SUPPORT OF MOVANT MINNESOTA DEPARTMENT OF HUMAN SERVICES' MOTION TO MODIFY SUBPOENA AND FOR SHIFTING OF COSTS** |
| *Defendants*, | |
| MINNESOTA DEPARTMENT OF HUMAN SERVICES, | |
| *Movant.* | |

## INTRODUCTION

The Minnesota Department of Human Services ("MDHS"), a non-party to this litigation, submits this memorandum in support of its Motion to Modify Subpoena and for Shifting of Costs.  As set forth below, MDHS will be forced to incur substantial expense to comply with Defendants' extensive requests under the October 2020 Subpoena.  MDHS has worked in good faith to mitigate the burden of compliance, and Defendants continue to oppose any cost-sharing.  Under Rule 45 of the Federal Rules of Civil Procedure, MDHS is entitled to modification of the Subpoena or to be reimbursed for its costs of compliance.

## BACKGROUND

### I.   THE UNDERLYING LITIGATION

In October 2018, on behalf of the State of Minnesota, Attorney General Keith Ellison sued three of the world's largest insulin manufacturers, alleging that they publish deceptive and misleading list prices for their products while offering high rebates for purposes of their negotiations with pharmacy benefit managers.  *See Minn. by Ellison v. Sanofi-Aventis U.S. LLC* ("*Sanofi-Aventis I*"), No. 2:18-CV-14999, 2020 WL 2394155, at *1, 6 (D.N.J. Mar. 31, 2020) (the "Underlying Litigation"); (*see also* Decl. of Michael Leonard ("Leonard Decl.") Ex. 1 (Second Amended Complaint ("SAC")) at 2–3).  As a result, the State alleges that Defendants have harmed Minnesotans—including those with high-deductible health plans, uninsured state residents and those who pay coinsurance, Minnesota Medicare beneficiaries, and the Minnesota Department of Corrections—who pay for insulin based on the inflated list price.  (SAC at 3–4).  The State sought relief including an order "awarding the State of Minnesota, its residents, and the Minnesota Department of Corrections monetary relief…"  (*Id.* ¶ 417).

### II.   THE MINNESOTA DEPARTMENT OF HUMAN SERVICES.

The Minnesota Department of Human Services ("MDHS") is Minnesota's largest state agency.  Declaration of David Greeman ¶ 2.  MDHS is responsible for administering state economic assistance programs; overseeing child protection and child welfare services; providing services for individuals with mental illness, chemical dependency, and physical or developmental disabilities; and administering the Minnesota Health Care Programs.  *Id*.  MDHS serves over 1.5 million people statewide.  *Id*.  MDHS's stated

mission is to help citizens of the State "meet their basic needs so they can live in dignity and achieve their highest potential." *Id.*[1]

MDHS is not a party to the Underlying Litigation, it is not mentioned in the Second Amended Complaint, and damages to MDHS are not part of the State's theory of the case. (*See generally* SAC). MDHS is a state agency, funded by taxpayers, and with a limited budget sourced from a mixture of federal awards, contractual agreements, and other amounts set by the Minnesota Legislature. Greeman Decl. ¶ 3.

## III. THE SUBPOENA.

In October 2020, Defendants served a subpoena on MDHS issued in connection with the Underlying Litigation (the "Subpoena"). (*See* Johnson Decl., Ex. 1). The Subpoena sought production of 30 broad categories of documents, dating over a period of eight years for "unstructured data" and 10 years for "structured data." In addition to formal contracts and related documents, the Subpoena broadly sought documents relating to drug rebates, (*see id.* at Request Nos. 1, 3, 4, 5, 14, 22-28), the names and identifying information of individual insulin users and the details of their prescriptions (including for drugs other than insulin) (*id.* at Request Nos. 8–9), all other medical services provided to them (*id.* at Request No. 9), and the names and coverage details of all individual state health plan enrollees on whose behalf the State asserts claims in this action (*id.* at Request No. 10).

---

[1] *See* DHS, *Who We Are*, available at https://mn.gov/dhs/general-public/about-dhs/who-we-are/ (visited Dec. 2, 2021).

MDHS objected to the Subpoena as unduly burdensome, vague, overbroad, seeking information that MDHS is prohibited from disclosing, and seeking privileged information. Declaration of Andrew Johnson, Ex. 2. DHS also proposed a list of search terms that were tailored to substantially reduce the burden on MDHS of responding to the subpoena. *Id*., ¶ 3, Ex. 3.

While maintaining its objections, MDHS loaded over 2.5 million documents into an electronic discovery platform for purposes of discussing a production based on search terms and potentially conducting a document review before production. Leonard Decl, ¶ 3, Ex. 2. Defendants requested production of documents responsive to a broad list of search terms, many of which (such as "best price" and "average wholesale price") were not specifically tied to insulin or Defendants' business. Johnson Decl., Exs. 4–5. MDHS provided a search term report indicating that Defendants' proposed terms hit on more than 1.1 million documents (including family members). Leonard Decl., Ex. 2. MDHS also provided its own proposed search terms, which tied Defendants' broad search terms to the specific drugs and companies involved in this litigation. *Id*. These search terms hit on only about 26,600 documents and family members. *Id*.[2]

Over the next two months, the parties continued to communicate regarding search terms, with MDHS continuing to suggest revisions that would greatly reduce the number of search hits and the burden on the agency. Leonard Decl., Exs. 5–12. By July 9, 2021,

---

[2] The original search term reports included all documents without regard to date. When limited to the date range specified in the Subpoena, Defendants' proposed terms hit on approximately 888,000 documents, while MDHS's proposed terms hit on approximately 16,205 documents. *See* Leonard Dec., Exs. 3–4.

Defendants had agreed to remove some of their proposed search terms.  Leonard Dec., Ex. 12.  Defendants' revised terms, however, still generated approximately 190,000 search hits, and included many terms relating to insulin and diabetes generally without reference to the specific drugs or parties involved in this litigation, as DHS had suggested.  Leonard Decl., Exs. 9–12.  Although Defendants ultimately accepted some of MDHS's proposed revisions to Defendants' search terms, MDHS maintained its objection based on undue burden and reiterated that it was not agreeing to assume the costs of document review and production.  Leonard Decl., Exs. 11–12.

Due to the expansive scope of the subpoenas and the Defendants' proposed search terms, in May 2021 MDHS issued a Request for Proposals ("RFP") to identify a vendor that could complete the document review (and other upcoming document review projects) if Defendants were unwilling to substantially narrow their proposed search terms.  Declaration of Dora Burns ¶ 3; *see* Minn. Stat. § 16C.06 (mandating public notice and competitive bidding for the award of contracts in excess of $25,000).

## IV.   THE BURDEN OF COMPLIANCE.

### A.   MDHS's Confidentiality Obligations Require Manual Review Of Documents Before Production.

Several provisions of state and federal law govern disclosure of documents sought in the subpoena or likely to be responsive to Defendants' search terms.  As a result, MDHS must engage in a costly manual review before producing documents to Defendants.  Because of the volume of documents at issue, MDHS has contracted with a third-party vendor, who will complete this review at substantial expense.

**B.     The Minnesota Government Data Practices Act.**

The Minnesota Government Data Practices Act ("MGDPA") designates medical data and welfare data as private.  Minn. Stat. §§ 13,02, subds. 3, 12; 13.384, subd. 3; 13.46, subd. 2.  The MGDPA prohibits DHS from disclosing such data absent a court order (or in certain other circumstances not applicable here) and creates civil liability for disclosure.  *See* Minn. Stat. §§ 13.08, subd. 1; 13.46, subd. 2; 13.384, subd. 3.  As noted, the subpoena expressly sought names and identifying information of individual insulin users as well as details about their insulin and other prescriptions, all other medical services provided to them, and the names and coverage details of individual state health plan enrollees.  (Johnson Decl., Ex. 1, at Requests 8–10.)  This information constitutes medical data and welfare data under the MGDPA.  *See* Minn. Stat. § 13.384, subd. 1 (defining medical data as "data collected because an individual was or is a patient or client of a hospital, nursing home, medical center, clinic, health or nursing agency operated by a government entity including business and financial records, data provided by private health care facilities, and data provided by or about relatives of the individual"); Minn. Stat. § 13.46, subd. 2 (restricting the disclosure of any "[d]ata on individuals [that is] collected, maintained, used, or disseminated by the welfare system"); *see also* Minn. Stat. § 13.46, subd. 1 (defining the welfare system to include MDHS).

**C.     Trade Secret Information.**

Similarly, Minnesota law prohibits MDHS from producing trade secret information.  *See* Minn. Stat. § 13.37, subds. 1(b), 2(a).  The subpoena seeks documents relating to pricing, rebate and discount information, as well as contract terms, all of

6

which could include protected trade secrets that MDHS may not disclose. (*See, e.g.*, Johnson Decl., Ex. 1, at Requests Nos. 1–5, 7, 14, 22–28).

**D.    Drug Rebate Information.**

Additionally, federal law prohibits state agencies like MDHS from disclosing certain drug price and rebate information disclosed to them by manufacturers. *See* 42 U.S.C. § 1396r-8(b)(3)(D). The subpoena specifically seeks the production of such information. (*See*, *e.g.*, Johnson Decl., Ex. 1, at Request Nos. 1, 3, 4, 5, 14, 22–28).

**E.    The Volume Of Responsive Documents Required MDHS To Contract With A Third-Party Vendor.**

Because Defendants specifically seek production of documents protected from disclosure under state and federal law—and because Defendants' search terms are extremely broad—MDHS anticipates that the search terms will produce substantial amounts of protected health information, welfare data, trade secret data, and protected drug price and rebate information. And because MDHS is barred from disclosing such data, a manual review will be necessary before any documents are produced in response to the subpoena.

Given the breadth of the subpoenas and the substantial number of documents returned by Defendants' broad search terms, MDHS determined that it would need to hire a third-party vendor to complete the document review. Leonard Decl., Ex. 14, at 5. Minnesota law requires that such contracts be awarded through a competitive bidding process, *see* Minn. Stat. § 16C.06, and on May 7, 2021, MDHS issued a request for

7

proposals to identify a vendor for multiple upcoming document-review projects.   Burns Decl., Ex. 1.

The RFP closed on June 2, 2021.  Burns Decl. ¶ 3.  MDHS completed scoring the bids in late July, and by September 21, 2021, it had finalized a contract with the winning bidder.   *Id*.   The winning vendor estimates a cost of $261,000 to review the 190,000 documents that were responsive to Defendants' search terms.  Leonard Decl., Exs. 13–14.  The vendor estimates that this review will take approximately three months to complete.  Leonard Decl., Ex. 14.

Defendants have refused to reimburse MDHS for the reasonable costs of the document review because, according to Defendants, MDHS is not a true third party to this litigation and because the Department did not provide evidence of the burden of production, such as a cost estimate.  Leonard Decl. Exs. 5, 14.  MDHS provided that cost estimate to Defendants on October 11, 2021, and on October 20, 2021, renewed its requests that Defendants agree to reimburse it for the costs of the document review.  Leonard Decl., Exs. 13, 14.  Defendants declined to do so.  Leonard Decl. Ex. 14.

The cost of the review represents a substantial burden on MDHS.   MDHS's funding is intended for specific purposes and must be budgeted for those purposes at the beginning of the fiscal year.  Greeman Decl. ¶ 3; Minn. Stat. § 16A.14, subds. 3–4.  For unanticipated or unbudgeted expenses, MDHS temporarily sets aside a portion of its funding each year to pay for unanticipated or unbudgeted expenses.  Greeman Decl. ¶ 4.  These funds are provided through a temporary internal loan that must be repaid through unspent appropriations at the end of the fiscal year.  *Id.* ¶ 4.  MDHS's budget does not

include funding for the document review in this matter, and if MDHS is forced to assume the costs of that review it plans to do so from the set-aside funds. *Id.* ¶ 5.

If these funds are not used to pay for the costs of the review, MDHS plans to use them to fill staffing gaps relating to compliance risks and process improvement. *Id*. Specifically, MDHS would likely use the funds to hire approximately two full-time employees in its Contracts unit and one full-time employee in its Continuous Improvement team. *Id*. The Contracts Unit staff are necessary to oversee and support MDHS program areas with regard to federal and state contract requirements, which have increased in complexity in recent years. *Id*. The Continuous Improvement team staff would work on projects relating to program and process simplification, developing and implementing new processes, reducing waste, identifying and mitigating risk, and training DHS staff to use continuous improvement methodologies. *Id.* These improvements are aimed at fulfilling MDHS's mission of helping citizens of the State to meet their basic needs, live in dignity, and realize their full potential. *Id*. If MDHS is required to bear the burden of responding to the subpoena, the addition of these positions would be delayed for a year. *Id*.

## ARGUMENT

Pursuant to Fed. R. Civ. P. 45, this Court must modify the Subpoena because it is unduly burdensome on MDHS. Alternatively, if the Court does not modify the Subpoena, it must shift the costs of compliance with the Subpoena to Defendants.

I.     **THE COURT SHOULD MODIFY THE SUBPOENA BECAUSE IT IS UNDULY BURDENSOME ON MDHS.**

"A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  Fed. R. Civ. P. 45(d)(1).  Where this requirement is disregarded, the Court "is required [to] . . . modify a subpoena that . . . subjects a person to undue burden."  Fed. R. Civ. P. 45(d)(3)(A).  The Court should modify the Subpoena to protect MDHS from undue burden.

A.     **The Subpoena Unduly Burdens MDHS.**

Under Rule 45, a party may bring a motion to quash or modify a subpoena in the "district where compliance is required"—here, the District of Minnesota.  Fed. R. Civ. P. 45(d)(3)(A); *see, e.g.*, *Pete v. Big Picture Loans*, LLC, No. 019MC00077JRTKMM, 2019 WL 6250715, at *1 (D. Minn. Nov. 22, 2019); *see also* Johnson Decl., Ex. 1 (indicating that the place for compliance is Minneapolis, Minnesota).  In assessing undue burden, courts consider seven factors:  "(1) relevance; (2) the need for the discovery; (3) how broadly the requests are framed; (4) the time period covered by the subpoena; (5) how particularly the subpoena describes the documents sought; (6) the burden imposed; and (7) that the recipient is a non-party to the litigation."  *Cedar Rapids Lodge & Suites, LLC v. Seibert*, No. 14-CV-04839, 2018 WL 3019899, at *3 (D. Minn. June 18, 2018) (citing *Biomet, Inc. v. Howmedica Ostenics, Corp.*, No. 14–cv–6634 (MAS)(DEA), 2015 WL 1543221, at *3 (D.N.J. Apr. 7, 2015)); *Gregerson v. Vilana Fin., Inc.*, No. CV 06-1164, 2006 WL 8443418, at *2 (D. Minn. Dec 6, 2006).  "[T]he 'burden

10

thrust upon non-parties' is of particular concern when evaluating third-party subpoenas." *Neo Ivy Cap. Mgmt. LLC v. Savvysherpa LLC*, No. 18-MC-0094, 2019 WL 1435058, at *4 (D. Minn. Mar. 8, 2019) (quoting *Misc. Docket Matter No. 1 v. Misc. Docket Matter No. 2*, 197 F.3d 922, 927 (8th Cir. 1999)).

First, while this litigation involves specific long-acting and rapid-acting insulin products manufactured by specific parties, Defendants' search terms broadly seek information about insulin and diabetes, linked only with search terms relating to cost, discounts, drugs, medication, or the drug formulary. By design, these search terms will return many documents that are irrelevant to the drugs and companies involved in this litigation. Indeed, DHS's proposed search terms, which included such limitations, returned ten times fewer documents.

Second, the document requests in the Subpoena—as implemented in Defendants' search terms—are also overbroad insofar as they seek privileged information and information that MDHS cannot legally disclose. As discussed above, the Subpoena—and Defendants' search terms—specifically seek documents and information that MDHS is prohibited from disclosing under State and federal law, including individual health records and welfare data and drug rebate information. Additionally, Defendants' search terms seek documents that include the term "Attorney General" (coupled with general terms relating to drugs and cost) and are therefore likely to return privileged communications with the Attorney General's Office, which represents MDHS in public assistance appeals, licensing matters, and other litigation. Nevertheless, Defendants have declined to tailor their search terms to eliminate or reduce such information.

11

Third, and relatedly, the burden on MDHS is substantial.  In part because the Subpoena seeks materials that are privileged or protected from disclosure, MDHS must engage in a costly manual review to ensure that no materials are produced that include protected medical, welfare, drug rebate, trade secret, or other information.  MDHS's contracted vendor estimates that this review will cost over a quarter of a million dollars.

**B.     MDHS Is A Non-Party To The Underlying Litigation.**

Fourth, as a non-party, the burden on MDHS should be "of particular concern" to this Court.  *Neo Ivy Cap. Mgmt.*, 2019 WL 1435058, at \*4.  As discussed, Attorney General Ellison commenced the Underlying Litigation on behalf of Plaintiff, State of Minnesota, pursuant to statutory authority (*i.e.*, Minn. Stat. ch. 8) and *parens patriae* authority.  (*See* SAC ¶ 5).  The Attorney General did not sue on behalf of, or as counsel for, MDHS or to enforce any MDHS-specific laws.  Indeed, the only state agency mentioned by name in the Complaint is the Minnesota Department of Corrections, and damages to MDHS are not part of the Attorney General's theory of the case, nor will DHS receive any potential proceeds if the lawsuit is successful.

Further, there is a strong presumption "that separate governmental agencies under state law will not be aggregated together" for discovery purposes.  *New York ex rel. Boardman v. Nat'l R.R. Passenger Corp.*, 233 F.R.D. 259, 264 (N.D.N.Y. 2006); *see also Colorado v. Warner Chilcott Holdings Co. III, Ltd.*, No. CV 05-2182, 2007 WL 9813287, at \*4 (D.D.C. May 8, 2007) (requiring a "strong showing" to aggregate separate state governmental agencies).  Because the "element of control" is fundamental to defeat this presumption, the Court should not aggregate two state agencies where one agency lacks

the ability to "control the other agency's agenda, documents or personnel." *Id.* at 264-66. Defendants cannot show that the Attorney General has authority to control MDHS's agenda, documents, or personnel.

This issue is not novel. Indeed, courts have overwhelmingly declined to treat state agencies as parties for discovery purposes where state attorneys general serve as party litigants, because the state attorneys general and the state agencies were "neither interrelated nor subject to common executive control." *Warner Chilcott Holdings*, 2007 WL 9813287, at *4. As one court explained, "the decision hinge[s] on the duality of the States' executive branches." *United States v. Am. Express Co.*, No. 10-CV-04496, 2011 WL 13073683, at *1-2 (E.D.N.Y. July 29, 2011). This duality of the executive branch means that state attorneys general "are not subject to discipline or removal" by their respective governors, and they "bring suit under their own authority." *Warner Chilcott Holdings*, 2007 WL 9813287, at *4. Further, state attorneys general cannot force "separate state agencies to produce documents." *Am. Express Co.*, 2011 WL 13073683, at *1-2. The practical result is that "the Governor may direct the Attorney General, but the Attorney General has no such reciprocal power to control the Governor or agencies organized under his authority." *In re Jointly Managed R.S. 2477 Rd. Cases Litig. v. United States*, No. 2:10-CV-1073, 2018 WL 2172934, at *2 (D. Utah May 10, 2018). Because a duality of the executive branch exists in the State of Minnesota, the same rationale applies here.

The Governor and Attorney General are both constitutional officers and elected officials. Minn. Const. art. 5, § 1 (constitutional officers include the "governor,

lieutenant governor, secretary of state, auditor, and attorney general"). As such, the Governor has no power to discipline or remove the Attorney General. And the Attorney General's discretion as to what litigation shall or shall not be commenced "is plenary" and "beyond the control of any other officer or department of the state." *State ex rel. Peterson v. City of Fraser*, 191 Minn. 427, 432, 254 N.W. 776, 778–79 (1934); *see also Warner Chilcott Holdings*, 2007 WL 9813287, at *4.

Moreover, the Office of the Attorney General and MDHS are separate entities established under different laws; they are not interrelated agencies and do not share a common mission. *See New York ex rel. Boardman*, 233 F.R.D. at 264 (declining to aggregate two New York state agencies, in part, because they "are not interrelated agencies, do not have a similar mission, and are situated at different spectrums of New York State governance as established by constitution and legislation"); *cf. People ex rel. Lockyer v. Superior Ct.*, 122 Cal. App. 4th 1060, 1077–78, 19 Cal. Rptr. 3d 324, 337 (2004) (concluding that the People of California do not have possession, custody or control over state agency documents because "[e]ach agency or department of the state is established as a separate entity, under various state laws or constitutional provisions"). In contrast to the Attorney General, who is a constitutional officer, MDHS was established by statute, and its commissioner is appointed by the Governor. Minn. Stat. § 245.03, subd. 1. Thus, MDHS and its commissioner are subject to discipline and removal by the Governor but not the Attorney General.

Defendants "bear[] the burden of establishing control." *DeSmeth v. Samsung Am., Inc.*, No. 92 CIV. 3710, 1998 WL 74297, at *9 (S.D.N.Y. Feb. 20, 1998). Because they

cannot establish that the Attorney General has authority to control MDHS's agenda, documents or personnel, this Court should decline to treat it as a litigant for discovery purposes.

Finally, requiring MDHS to shoulder the same discovery burdens as Plaintiff merely because it is an agency of the State of Minnesota would potentially subject Minnesota's 24 state departments and agencies, as well as other public authorities and governmental bodies, to the same discovery burdens as any litigant merely because they are part of Minnesota's state government. This is nonsensical and would lead to an absurd result that the Court should reject. *See Wandering Dago Inc. v. New York State Off. of Gen. Servs.*, No. 1:13-CV-1053 MAD, 2015 WL 3453321, at *8 (N.D.N.Y. May 29, 2015) (declining to aggregate governmental agencies under circumstances that "would lead to illogical consequences"); *see also New York ex rel. Boardman*, 233 F.R.D. at 266 (same).

In sum, the circumstances of this case weigh heavily in favor of a determination that the Subpoena imposes undue burden on MDHS, a non-party.

## C.   Modifying The Subpoena Will Appropriately Mitigate The Burden To MDHS.

Modifying the Subpoena consistent with MDHS's proposed search terms (*see* Leonard Dec., Ex. 4) will mitigate the burden to MDHS while still providing Defendants with relevant documents. As discussed, MDHS's proposed search terms would link Defendants' terms to other terms relating to the specific drugs and manufacturers involved in this litigation. As modified, these terms would reduce tenfold the number of

documents that must be reviewed while still hitting on over 16,000 documents that include terms directly relevant to the companies and drugs at issue in the underlying litigation. *See* Leonard Dec., Ex. 4.

## II. ALTERNATIVELY, THE COURT SHOULD SHIFT THE COSTS OF COMPLIANCE WITH THE SUBPOENA TO DEFENDANTS BECAUSE MDHS IS ENTITLED TO PROTECTION FROM SIGNIFICANT EXPENSE.

If the Court does not modify the Subpoena, then it should protect MDHS "from significant expense resulting from compliance," Fed. R. Civ. P. 45(d)(2)(B), by shifting MDHS's "costs of compliance, provided that those costs are significant." *Paisley Park Enters., Inc. v. Boxill*, No. 17-CV-1212, 2019 WL 1036059, at *5 (D. Minn. Mar. 5, 2019) (citing *Cedar Rapids Lodge & Suites*, 2018 WL 3019899, at *2). Put differently, if the Court "finds that compliance would impose significant expense on the non-party, Rule 45(d)(2)(B)(ii) *requires* the court to shift the costs of compliance." *B. Riley FBR, Inc. v. Clarke*, No. 18-CV-2318, 2020 WL 2488045, at *1 (D. Minn. May 13, 2020) (emphasis added) (citing *Balfour Beatty Infrastructure, Inc. v. PB & A, Inc.*, 319 F.R.D. 277, 281 (N.D. Cal. 2017)).

To shift costs, the Court need only answer two questions: "whether the subpoena imposes expenses on [a] non-party, and whether those expenses are 'significant.' If they are, the court must protect the non-party by requiring the party seeking discovery to bear at least enough of the expense to render the remainder 'non-significant.'" *Linder v. Calero-Portocarrero*, 251 F.3d 178, 182 (D.C. Cir. 2001); *see also Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013) (concluding that Rule 45 "provides no exceptions," that it "is mandatory," and that the only inquiry "is whether the subpoena

imposes significant expense on the non-party"); *United States v. McGraw-Hill Cos.*, 302 F.R.D. 532, 535 (C.D. Cal. 2014) (declining to apply the pre-1991 Rule 45 factors in considering whether to shift costs).[3]  In this case, both questions must be answered in the affirmative.

First, as discussed above, the Subpoena imposes expenses on a non-party, MDHS. To the extent that the Court considers whether MDHS has an interest in the outcome of the Underlying Litigation, this answer should not change.  While MDHS may have a generalized interest in the health and well-being of state citizens, this interest is far too attenuated to force MDHS to bear the costs of responding to the Subpoena.

The Underlying Litigation alleges that "residents of Minnesota and the Department of Corrections have paid inflated prices for life-saving insulin because of Defendants' practices."  *Minnesota by its Ellison v. Sanofi-Aventis U.S. LLC* ("*Sanofi-Aventis II*"), No. 3:18-CV-14999, 2021 WL 2201176, at *1 (D.N.J. Mar. 12, 2021).  And the Second Amended Complaint seeks to award "the State, its residents, and the Minnesota Department of Corrections monetary relief."  (SAC ¶ 455).  In contrast to the Department of Corrections, the Second Amended Complaint does not mention MDHS

---

[3]  Defendants may argue that the Court should consider other factors, including MDHS's "interest in the outcome of the case," whether MDHS "can more readily bear the costs than the" Defendants, and "whether the litigation is of public importance." *Paisley Park Enters.*, 2019 WL 1036059, at *5.  These factors were instructive prior to Rule 45's amendment in 1991, when cost-shifting was within the discretion of the district court.  *See Linder*, 251 F.3d at 182.  But Rule 45, as amended, *requires* shifting costs if the expenses are significant. *Id.* at 182-83.  Consequently, some of these factors, "like the public importance of the litigation, do not bear on the question of whether 'the subpoena imposes significant expense on the non-party.'" *United States v. McGraw-Hill Cos.*, 302 F.R.D. 532, 535 (C.D. Cal. 2014).  Even if the Court considered these three factors, however, cost-shifting would still be appropriate.

and does not seek damages on its behalf.  To the extent that MDHS would benefit at all from the relief sought in the Underlying Litigation, such benefit is far too attenuated to justify imposing the costs of compliance on MDHS.

Second, as discussed above, those costs are substantial.  Although the Federal Rules and the Eighth Circuit have not articulated a precise standard for determining what constitutes significant expense, courts in other jurisdictions generally agree that more than $20,000 in expenses is significant.  *See, e.g.*, *Legal Voice*, 738 F.3d 1178, 1185 (9th Cir. 2013) (stating that "we have no trouble concluding that $20,000 is 'significant' " and concluding that district court erred in considering whether compliance would be unduly burdensome rather than a significant expense); *Linder*, 251 F.3d at 182 ("We have no trouble concluding that [$199,537.08] is [a significant expense]."); *G & E Real Est., Inc. v. Avison Young-Wash., D.C., LLC*, 317 F.R.D. 313, 316 (D.D.C. 2016) (concluding that $145,843.50 in attorney's fees and $2,010.94 in invoices was significant); *DeGeer v. Gillis*, 755 F. Supp. 2d 909, 927-29 (N.D. Ill. 2010) (concluding that some cost-shifting was appropriate after non-party paid "in excess of $130,000"); *Williams v. City of Dallas*, 178 F.R.D. 103, 113 (N.D. Tex. 1998) (suggesting that $9,000 may be sufficiently significant to shift costs).  In considering the burden on DHS, the Court appropriately considers the expense of conducting a document review to ensure that protected information is not disclosed.  *See In re Mod. Plastics Corp.*, 577 B.R. 690, 703 (W.D. Mich. 2017) (Compliance with subpoenas directed at non-parties who were "highly regulated and highly sensitive to customer privacy issues" also tends to result in

18

significant expense because it "would take considerable time (including attorney time) and other resources" to respond.).

Here, MDHS's vendor estimates that compliance with the Subpoena will cost approximately $261,000. This expense would present a significant opportunity cost, as it would be drawn from set-aside funds that MDHS has earmarked for the hiring of three full-time employees for MDHS's Contracts Unit and Continuous Improvement team. Greeman Decl. ¶¶ 4–5.

The Court should have no trouble concluding that MDHS cannot "more readily bear the costs than" Defendants. *Paisley Park Enters.*, 2019 WL 1036059, at *5. MDHS is a state agency, funded by taxpayers, and with a limited budget sourced from a mixture of federal awards, contractual agreements, and other amounts set by the Minnesota Legislature. Greeman Decl. ¶ 3. As discussed, MDHS's budget does not include funds for the document review, and DHS will pay for the review with funds that could otherwise be used for important initiatives relating to compliance and process improvements. *Id.* ¶ 5. If MDHS must shoulder the costs of the document review, the agency will forego adding three full-time positions relating to these initiatives for a year. *Id*.

Defendants, on the other hand, are far more capable of bearing the costs of compliance. Defendants are three of the largest insulin manufactures in the world. *See Minn. by Ellison v. Sanofi-Aventis U.S. LLC*, No. 2:18-CV-14999, 2021 WL 2201176, at *1 (D.N.J. Mar. 12, 2021). Defendant Novo Nordisk, Inc. is ranked 260 on Forbes' Global 2000 list, and it reported 2020 net sales exceeding

$19.8 billion to the Securities and Exchange Commission ("SEC") on its Form 6-K dated February 3, 2021.[4]  In the first nine months of 2021, the company reported net profit of 36.865 billion Danish kroners, or approximately $5.6 billion.[5]  Defendant Eli Lilly and Co. is ranked 118 on the Fortune 500, has made over $6 billion in 2021 profits, and reported 2020 revenue exceeding $24.5 billion.[6]  Defendant Sanofi-Aventis U.S. LLC does not report its financial information to the SEC, but its parent company, Sanofi, is ranked 276 on Fortune's Global 500 list, has made over $14 billion in 2021 profits, and reported net sales exceeding $42.1 billion in 2020 on its Form 20-F filing dated March 4, 2021.[7]  *See Pollitt v. Mobay Chem. Corp.*, 95 F.R.D. 101, 105 (S.D. Ohio 1982) (considering the vast financial resources available to a parent corporation in assessing whether the costs of compliance are significant).  Defendants would have no difficulty absorbing the costs of production.

---

[4] *See* Novo Nordisk A/S, *Securities & Exchange Commission Form 6-K*, available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0000353278/000162828021001358/nvo-20201231.htm;  Forbes, *Global 2000* (May 13, 2021), available at https://www.forbes.com/lists/global2000/#1b44fe1a5ac0 (visited Dec. 2, 2021).

[5] *See* Novo Nordisk, *Financial Report for the Period 1 January 2021 to 30 September 2021*, available at https://ml-eu.globenewswire.com/Resource/Download/55ede868-1686-4d59-9a68-ee0b4470d4e7 (visited Dec. 2, 2021); *see also* Federal Reserve, *Foreign Exchange Rates*, available at https://www.federalreserve.gov/releases/h10/current/ (visited Dec. 2, 2021).

[6] *See* Eli Lilly and Company, *Securities & Exchange Commission Form 10-K*, available at https://www.sec.gov/ix?doc=/Archives/edgar/data/59478/000005947821000083/lly-20201231.htm (visited Dec. 2, 2021); Fortune, *Fortune 500: Eli Lilly*, available at https://fortune.com/company/eli-lilly/fortune500/ (visited Dec. 2, 2021).

[7] *See* Sanofi, *Securities & Exchange Commission Form 20-F*, available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1121404/000112140421000004/sny-20201231.htm (visited Dec. 2, 2021); Forbes, *Global 500: Sanofi*, available at https://fortune.com/company/sanofi/global500/ (visited Dec. 2, 2021).

In sum, Rule 45 is unequivocal: this Court "*must* protect [MDHS] . . . from significant expense resulting from compliance." Fed. R. Civ. P. 45(d)(2)(B)(ii) (emphasis added). Because complying with the Subpoena would result in significant expense to MDHS, the Court must shift the costs of compliance to Defendants.

## CONCLUSION

In light of the foregoing, MDHS respectfully asks this Court to modify the Subpoena to prevent undue burden on MDHS or, alternatively, to shift the costs of compliance with the Subpoena to protect MDHS from significant expense.

Dated: December 6, 2021                        Respectfully submitted,

                                                             KEITH ELLISON
                                                             Attorney General
                                                             State of Minnesota

                                                             **s/ Michael N. Leonard**
                                                             MICHAEL N. LEONARD
                                                             Assistant Attorney General
                                                             Atty. Reg. No. 0395070

                                                             445 Minnesota Street, Suite 1400
                                                             St. Paul, Minnesota 55101-2131
                                                             (651) 757-1211 (Voice)
                                                             (651) 282-5832 (Fax)
                                                             michael.leonard@ag.state.mn.us

                                                             *Attorney For Movant*
                                                             *Minnesota Department of Human Services*

|#5082733-v2